UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------

ERICA VLADO,

                    Plaintiff,

          v.

NANCY A. BERRYHILL,[1]
*Acting Commissioner, Social Security
Administration*

                    Defendant.

------------------------------------------------------------

**<u>MEMORANDUM & ORDER</u>**
16-CV-794 (MKB)

MARGO K. BRODIE, United States District Judge:

Plaintiff Erica Vlado filed the above-captioned action pursuant to 42 U.S.C. § 405(g),

seeking review of a final decision of the Commissioner of Social Security (the "Commissioner")

denying her claim for supplemental security income under the Social Security Act (the "SSA").

(Compl., Docket Entry No. 1.)  Plaintiff moves for judgment on the pleadings pursuant to Rule

12(c) of the Federal Rules of Civil Procedure, arguing that Administrative Law Judge Dina

Loewy (the "ALJ") erred by (1) failing to give controlling weight to the opinion of Plaintiff's

treating physician, (2) failing to develop the record and (3) failing to credit Plaintiff's testimony.

(Pl. Mot. for J. on the Pleadings ("Pl. Mot."), Docket Entry No. 16; Pl. Mem. in Supp. of Pl.

Mot. ("Pl. Mem."), Docket Entry No. 17.)  The Commissioner cross-moves for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that the ALJ's

decision was supported by substantial evidence.  (Comm'r Cross-Mot. for J. on the Pleadings

("Comm'r Mot."), Docket Entry No. 13; Comm'r Mem. in Supp. of Comm'r Mot. ("Comm'r

---

[1]  Pursuant to Fed. R. Civ. P. 25(d), the caption has been updated to reflect the new Acting
Commissioner of Social Security, Nancy A. Berryhill, who took office on January 23, 2017.

Mem."), Docket Entry No. 14.)  For the reasons discussed below, the Court grants Plaintiff's motion for judgment on the pleadings, denies the Commissioner's cross-motion for judgment on the pleadings and remands the case for further proceedings consistent with this Memorandum and Order.

## I.  Background

Plaintiff is thirty-four years old.  (Certified Admin. Record ("R.") 154, Docket Entry No. 10.)  Plaintiff does not have any children.  (R. 40.)  Plaintiff attended school until the fourth grade and then received private tutoring until the age of sixteen.  (R. 178, 539.)  Plaintiff has never been employed.  (R. 178.)

On May 30, 2012, Plaintiff applied for supplemental security income, alleging that she had been disabled since 1999 due to Crohn's disease, anxiety and depression.  (R. 154, 174, 178.)  A disability adjudicator initially denied her application on September 11, 2012, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (R. 65, 71, 122.)  The ALJ held a hearing on June 12, 2014, and Plaintiff appeared via video with her non-attorney representative.  (R. 35–56, 150.)  By decision dated August 22, 2014, the ALJ denied Plaintiff's application, finding that she was not disabled.  (R. 5–17.)  Plaintiff sought review before the Appeals Council, which review was denied on December 18, 2015, making the ALJ's decision the Commissioner's final decision.  (R. 1–3, 30.)  Plaintiff filed a timely appeal with the Court.

### a. Hearing before the ALJ

The ALJ held a hearing on Plaintiff's application on June 12, 2014, and heard testimony from Plaintiff and Cherie Plante, a vocational expert.[2]  (R. 35–56.)  Plaintiff appeared via video with her non-attorney representative and Plante appeared via telephone.  (R. 38, 150.)

### i. Plaintiff's testimony

Plaintiff testified as follows.  At the time of the hearing, she was single and did not have any children.  (R. 40.)  Plaintiff and her mother lived together.  (R. 40.)  Her only source of income was public assistance.  (R. 40.)  Plaintiff was unemployed and has never held a job. (R. 41.)  She attended public school until the fourth grade and had a private home-school tutor thereafter.  (R. 40-41.)  On an average day, she focused on adhering to her diet, taking her medication, completing errands that were "not very far away from home" and attending doctor's appointments.  (R. 41.)  She was able to cook, clean, shop for groceries and do laundry.  (R. 42.) Her friends visited her at her home, and if she ventured outside or traveled to the mall, she had to "know where the nearest bathrooms" were.  (R. 42.)  She did not have any problems walking; she could stand for ten to fifteen minutes before she became dizzy; she could sit for three-to-four hours, unless she was "irritated" from using the restroom frequently and needed to lay down on her stomach; and she could lift five-to-ten pounds.  (R. 47–49.)

Plaintiff testified that she was disabled because her Crohn's disease caused her to visit the restroom repeatedly during the day, which in turn caused her fear and anxiety whenever she left home because she may have needed to find a restroom quickly and could find herself unable to access one.  (R. 42–43.)  She took Imodium and "Pepto-Bismol" tablets for relief, which reduced

---

[2]  The vocational expert, Cherie Plante, was identified in the hearing transcript incorrectly as Sherry Grant.  (*Compare* R. 35 (transcript) *with* R. 151 (curriculum vitae of Cherie Plante).)

the frequency with which she had to use the restroom, but they did not alleviate the nausea. (R. 43–44.) She was only able to reduce the frequency of her need to use the restroom by not eating or drinking. (R. 44.) She did not eat before attending the hearing because she wanted to avoid having to use the restroom repeatedly. (R. 50–51.) In 2008, Plaintiff was hospitalized for dehydration, but she had not been hospitalized since then. (R. 44.) The same year, she also had surgery to remove "obstructions and [] blockages" in her colon and intestines. (R. 46–47.) Plaintiff had not been hospitalized for any obstructions since the surgery. (R. 46–47.) The surgeon also removed "all of the bile salts from [her] intestines," which removal resulted in Plaintiff having to visit the restroom frequently. (R. 51.)

Plaintiff had a prescription for Humira, which her mother or sister administered by injection once a week. (R. 44–45.) She also had a prescription for Colestipol, which was for "the bile salts for the Crohn's." (R. 46.) The side-effects of her medications were "extreme anemia, dizziness, nause[a] and headaches." (R. 49–50.) As a result of her Crohn's disease, Plaintiff suffered from episodes of anemia. (R. 45.) Two weeks prior to the hearing, Plaintiff, for the first time, received an iron infusion due to anemia. (R. 45.) Plaintiff tried to control her Crohn's disease with a diet consisting of "clean foods" such as "chicken," "mashed potatoes," "yogurts with cultures" and "clean cereal, like Rice Krispies." (R. 50.) She avoided foods such as "raw fruits and vegetables," "sweets," "soda," "spicy foods" and "peanuts." (R. 50.)

### ii. Vocational expert testimony

Before vocational expert Plante began her testimony, the ALJ informed her of Plaintiff's age, level of education and lack of prior work experience. (R. 52–53.) The ALJ then told Plante to assume the following:

> a hypothetical claimant that can do medium work, never climbing ramps or stairs; never climbing ladders, ropes or scaffolds; frequently balancing, stooping, kneeling; occasionally crouching or

crawling. . . . [W]orking in a facility where she is indoors and has access to a bathroom on the premises; work limited to simple/routine tasks; no fast-paced production requirements and no assembly line work.

(R. 54.) The ALJ asked Plante if "there are any jobs [such] hypothetical claimant could perform." (R. 54) Plante testified that the hypothetical person could perform the job of a "dry-cleaner helper," "cleaner, industrial" and "cleaner II." (R. 54.) If the hypothetical person would be "off task ten percent of the day," Plante opined that the same jobs would still be available. (R. 54.) But Plante opined that the jobs would not be available if the hypothetical person would be "off task [twenty] percent of the day." (R. 54.)

### b. Medical evidence

#### i. Mount Sinai Hospital Medical Center

Plaintiff was diagnosed with Crohn's disease in 1999. (R. 272.) In 2008, she began receiving treatment at Mount Sinai Hospital Medical Center (the "Medical Center").[3] (R. 343.) On July 14, 2008, Plaintiff visited the Medical Center complaining of pain on the right side of her abdomen. (R. 356–57.) The attending triage nurse believed that Plaintiff's pain was due to a complication resulting her Crohn's disease. (R. 356.) The nurse recommended urgent treatment for Plaintiff. (R. 356.) After a computerized tomography ("CT") scan, a radiologist observed that Plaintiff had an "extensive perianal fistula disease" and a "large multiloculated complex structure" in the right lower quadrant, which was closely associated with abnormal appearances in her bowel loops and the right side of her uterus. (R. 358.) The radiologist also

---

[3] The record contains documents pertaining to Plaintiff's treatment prior to 2008, but many of them are either copies of lab reports without any medical opinions or handwritten notes that the Court is unable to decipher. (*See* R. 245–64.)

observed that Plaintiff had an abscess related to Crohn's disease or a tubo-ovarian abscess. (R. 358.) Plaintiff was held at the Medical Center for further evaluation. (R. 359.)

On July 22, 2008, physicians at the Medical Center performed an exploratory laparotomy, ileocolic resection, anterior resection, loop ileostomy, right salpingo-oophorectomy, left salpingtomy and cytstoscopy, and left ureteral stent placement to remove the abnormalities observed by the radiologist. (R. 349–50, 353–56.) On July 29, 2008, the Medical Center discharged Plaintiff with instructions to return for follow-up visits. (R. 351–52.)

Plaintiff returned to the Medical Center on February 27, 2009, for a reversal of the loop ileostomy. (R. 347–48.) The Medical Center discharged Plaintiff one week later, on March 4, 2009. (R. 347.)

### ii. Dr. Kenneth Miller

Plaintiff began treatment with Kenneth Miller, M.D., a gastroenterologist, on April 6, 2009. (R. 519.) Between April 6, 2009 and April 10, 2013, Plaintiff presented to Dr. Miller approximately bimonthly.[4] (R. 395–591.) During her visits with Dr. Miller, Plaintiff's reports of her symptoms and ailments predominantly were consistent, and included: stomach pain, diarrhea, irritation of the buttocks, nausea, fatigue, dizziness, shortness of breath and anxiety. (*See, e.g.*, R. 395–96, 503–10, 569–70, 589.) Dr. Miller diagnosed Plaintiff with possible irritable bowel syndrome, Crohn's disease of the small bowel and colon, depression and anxiety, unspecified. (R. 396–97, 522, 590–91.) Dr. Miller prescribed Humira, Colestid and 6-MP to treat Plaintiff's Crohn's disease and the related symptoms, as well as Lexapro and Seroquel to treat Plaintiff's anxiety. (R. 397, 483, 508–09, 514, 569–71, 590–91.) Dr. Miller also recommended that Plaintiff take Pepcid as needed. (R. 397.) During visits with Dr. Miller in August of 2009,

---

[4] Because many of Dr. Miller's notes are handwritten, the Court is unable to decipher some of the contents and some of the dates of Dr. Miller's reports.

December of 2009 and May of 2011, Plaintiff reported that the prescribed medications improved her Crohn's disease and the related physical symptoms. (R. 494, 508–09, 512). In addition, during visits with Dr. Miller in October of 2011 and February of 2012, she reported that the prescribed medications improved her anxiety. (R. 478, 484–85.)

While Plaintiff was under his care, Dr. Miller ordered colonoscopies and biopsies of Plaintiff's bowel and intestinal tract. (R. 448, 460–61, 472, 569.) The colonoscopies revealed a distal colonic surgical deformity; single polyp in the transverse colon; distal, ileocolic and ileolieal anastomosis; "a single ulcer just distal to the ileocolic anastomosis that was strictured" and could be passed only with a gastro-scope; scarred colonic mucosa; digitally dilated anal stricture; scared ileal mucosa; inflammatory pseudo polyps; deeply intubated terminal ileum; a stricture deep in the neo-terminal ileum that could not be traversed; mild cryptitis in the ileum; no active Crohn's in the ileum; and no mass lesions. (R. 448, 460–61, 472, 569.) Dr. Miller also ordered laboratory tests for Plaintiff in July of 2011, which revealed that Plaintiff had anemia.[5] (R. 491.)

On December 1, 2011, and February 9, 2012, Dr. Miller wrote identical letters "to whom it may concern," stating:

> [Erica Vlado] has been under my care for the past [three] years for the treatment of severe Crohn's disease. She has been unable to work due to her condition. Her condition leads to frequent trips to the bathroom, making travel difficult. She also gets severe abdominal pain at times due to adhesions and partial small bowel obstructions that occur unpredictably, and when they do, she is unable to do any task.

---

[5] Dr. Miller ordered several other laboratory tests while he was treating Plaintiff. The results of which are included in the Record. (R. 399–445, 496–97.) The Court does not recount these test results in detail because they do not contain opinions from Dr. Miller or the testing physicians.

(R. 480–81.) On December 12, 2012, Dr. Miller completed a Physical Medical Assessment Form related to Plaintiff's application for supplemental security income. (R. 564–68.) Dr. Miller repeated the diagnoses he made previously. (R. 564–65.) In addition, Dr. Miller stated that: Plaintiff's prescribed medications decrease her symptoms; the side effects of the medications limit her activities; her conditions likely would last at least twelve months; her "flare-up[s]" force her to lie down due to "severe" pain; and she has an "ongoing" anxiety disorder. (R. 565–67.) Dr. Miller opined that Plaintiff could travel to work alone by bus or subway and her limitations would cause "good days and bad days." (R. 566–67.) On July 5, 2013, Dr. Miller amended the form and opined that Plaintiff likely would miss four days of work per month due to her limitations. (R. 568.)

### iii. Consultative Examinations

#### 1. Dr. Chitoor Govindaraj

On August 23, 2012, Chitoor Govindaraj, M.D., examined Plaintiff in connection with her application for supplemental security income. (R. 541–43.) Dr. Govindaraj reported no abnormal findings, and opined that "the patient is medically cleared [with] [n]o restriction [in] sitting, standing or walking or weight restriction." (R. 542–43.) Dr. Govindaraj diagnosed Plaintiff with a history of Crohn's disease and stated that her "[o]verall medical prognosis is good." (R. 543.)

#### 2. Dr. Fritz Galette

On August 17, 2012, Fritz Galette, Ph. D., examined Plaintiff after she was referred to him by the New York State Office of Temporary and Disability Assistance. (R. 539.) Plaintiff reported that she traveled to the examination by herself via bus and avoided going places where she could not access a restroom quickly. (R. 539.) Plaintiff also reported that she dropped out of school when she was sixteen years old, had a "history of learning and academic problems," never

had a job, was on public assistance, did not have any children and was living with her mother. (R. 539.) Dr. Galette noted that Plaintiff's medical history was "remarkable for [Crohn's] disease and irritable bowel syndrome," that Plaintiff had no prior history of psychological, psychiatric or counseling treatment and that Plaintiff took anxiety medication that was "prescribed by her gastroenterologist." (R. 539.) Dr. Galette examined Plaintiff and found that: Plaintiff had an anxious mood and affect; her short term memory was below average; her long term memory intact; her knowledge of general facts was below average; she was able to perform simple calculations; her thought processes and content were unremarkable; she had no perceptual abnormalities; she denied hallucinations as well as suicidal and homicidal thoughts or ideations; her speech was of a normal rate and rhythm; her language use was adequate and followed a logical pattern; she was able to express thoughts and feelings; and her insight and judgment appeared limited. (R. 539–40.) Dr. Galette summarized that Plaintiff had a history of anxiety with panic attacks as well as learning and academic problems. (R. 540.) Dr. Galette diagnosed Plaintiff with a history of anxiety disorder and estimated borderline intellectual ability; he issued a rule-out[6] diagnosis for a learning disorder. (R. 540.)

### 3. Dr. L. Blackwell

On September 10, 2012, L. Blackwell, Ph. D., a psychologist for the Social Security Administration, examined Plaintiff and opined that Plaintiff had an "Anxiety Disorder" that did not satisfy the standard for a "medically determinable impairment." (R. 544, 549.) Dr. Blackwell opined that Plaintiff had no limitations regarding her activities of daily living;

---

[6] A "rule-out" diagnosis means that the physician is unable to make a medical determination based on the evidence currently available to him or her. *See Talavera v. Astrue*, 697 F.3d 145, 150 (2d Cir. 2012).

mild limitation in maintaining social functioning; moderate limitation in maintaining concentration, persistence or pace; and no repeated episodes of deterioration, each of extended duration. (R. 554.) As to Plaintiff's residual functional capacity ("RFC"), Plaintiff's mental abilities were moderately limited in five areas: (1) understanding and remembering detailed instructions; (2) carrying out detailed instructions; (3) completing a normal workday and workweek without interruptions from psychologically based symptoms; (4) performing at a consistent pace without rest periods that were unreasonable in number and length; and (5) responding appropriately to changes in the work setting. (R 558–59.) Plaintiff had no limitations in the other sixteen areas. (R. 558–59.) Plaintiff took anxiety medication prescribed by her gastroenterologist. (R. 560.)

Dr. Blackwell determined that the results of Plaintiff's examination were "remarkable for mood and affect anxious"; revealed a below average short term memory; and "insight and judgement appear[ed] limited." (R. 560.) Plaintiff reported that she suffered from panic attacks when she had to use the restroom suddenly but was unable to make it to the restroom. (R. 560.) Dr. Blackwell concluded that:

> Based on clinical findings, claimant's allegations are partially credible but any limitations are no more than mild to moderate. Claimant is able to perform personal care, clean, cook, do laundry, travel alone via walking and public transportation and shop for food and clothes; she goes out [three times] a week. Claimant is capable of understanding, carrying out and remembering simple instructions, using appropriate judgement to make simple work-related decisions, responding appropriately to supervision and co-workers and dealing with changes in a routine work setting. Claimant retains the capacity to perform work with simple task[s].

(R. 560.)

#### 4. Federation Employment & Guidance Service

On March 15, 2013, Plaintiff was examined by the Federation Employment & Guidance Service ("FEGS"). (R. 613–32.) Social worker Robin Kaynor conducted Plaintiff's intake review. (R. 613.) Plaintiff reported that she lived in an apartment with her mother. (R. 615–16.) She also reported that she had completed the fifth grade. (R. 617.) She had anxiety, which was related to her Crohn's disease and was being treated by Dr. Miller. (R. 620–21.) In the two weeks prior, there were "several days" where Plaintiff felt "down, depressed or hopeless"; had "little interest or pleasure in doings things"; had "trouble falling or staying asleep or sleeping too much"; felt "tired" or had "little energy"; and had "poor appetite" or overate. (R. 621.) Kaynor determined that Plaintiff's "depression severity" was "mild." (R. 621, 624.)

Plaintiff also reported that she traveled alone by bus to the FEGS appointment but avoided traveling during rush hour due to her Crohn's disease. (R. 622.) She spent her days at home unless she had a doctor's appointment. (R. 622.) She was able to "wash dishes, wash clothes, sweep/mop, vacuum, make beds, shop [for] groceries, cook meals, get dressed, bath[e], use [the] toilet [and] groom [her]self." (R. 622.) Her prescription medications were Colestid, Humira and 6-MP. (R. 627.)

FEGS physician David Guttman, M.D., examined Plaintiff and made the following findings. (R. 627.) Plaintiff had gastrointestinal issues due to Crohn's disease and suffered from diarrhea two to three times per day. (R. 628.) Her abdomen was soft with minimal tenderness in the lower left quadrant and no masses. (R. 628.) She had anxiety, unspecified, and regional enteritis. (R. 628, 631–32.) He opined that it would be difficult for Plaintiff to maintain stamina during the work day. (R. 632.) He also opined that if she obtained employment, she would require a modified work environment that allows for frequent and necessary breaks. (R. 632.)

### iv. Dr. David Hudesman

On June 25, 2013, Plaintiff started seeing David Hudesman, M.D. (R. 603.) Plaintiff reported that she was having stomach pain and ten bowel movements per day, which would come on suddenly. (R. 603.) As a result, she had lost fifteen pounds in four months. (R. 603.) Dr. Hudesman examined Plaintiff and noted that her abdomen was soft with tenderness in the lower left and upper right quadrants. (R. 604.) Dr. Hudesman diagnosed Plaintiff with regional enteritis, unspecified, diarrhea, generalized abdominal pain and weight loss. (R. 604.) Dr. Hudesman ordered magnetic resonance imaging ("MRI"), a colonoscopy and biopsies for Plaintiff. (R. 604.) Dr. Hudesman recommended that Plaintiff continue taking Humira and 6-MP as well as Colestipol to manage her "bile salt diarrhea." (R. 604.)

Dr. Hudesman performed Plaintiff's colonoscopy on August 15, 2013. (R. 609–10.) The pre-procedure examination revealed normal findings from the perianal and digital rectal examinations, normal mucosa in the colon, normal neo-terminal ilieum and small internal hemorrhoids during the retroflexion examination. (R. 609.) The colonoscopy revealed healed Crohn's ileocolitis, internal hemorrhoids without complication, diarrhea, digestive system disease, small bowel mucosa with mild chronic nonspecific inflammation in the neo-terminal ilieum, transverse and descending colonic mucosa with chronic nonspecific inflammation, sigmoid colonic mucosa with lymphoid aggregate and rectal colonic mucosa with focal chronic nonspecific inflammation. (R. 610–11.) Dr. Hudesman recommended that Plaintiff continue taking her medications and follow a "low residue diet, indefinitely." (R. 610.)

As a result of Dr. Hudesman's request, Plaintiff had an MRI on October 28, 2013, which revealed the following: under distention of the small bowel; a patulous loop of the small bowel within the lower pelvis, which may have represented a pseudo-sacculation from prior inflammatory bowel disease; anastomosis in the ileum of the small bowel; mild wall thickening

in the small bowel; mild adema in the mesentery; small lesions; and no abnormalities in the stomach, duodenum and large bowel. (R. 606–07.)

Plaintiff met with Dr. Hudesman on January 9, 2014, and reported improved abdominal pain, diarrhea that resulted in one to ten bowel movements per day and significant stress and anxiety. (R. 600.) Dr. Hudesman examined Plaintiff and noted that her abdomen was soft and had no tenderness, her rectum had an anal fissure and she had external hemorrhoids. (R. 601.) Dr. Hudesman diagnosed Plaintiff with regional enteritis, unspecified, diarrhea and anal fistula. (R. 601.) Dr. Hudesman opined that Plaintiff's diarrhea may be caused by her severe anxiety and stress. (R. 601.) He prescribed hemorrhoidal cream and recommended that Plaintiff continue taking Humira and 6-MP. (R. 601.) He also recommended that Plaintiff continue her current anti-anxiety medication, but noted that he would refer Plaintiff to a psychiatrist and change her anti-anxiety prescription if the medication did not improve her anxiety. (R. 601.)

c.    The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the SSA.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date, May 30, 2012. (R. 10.) At step two, the ALJ found that Plaintiff had severe impairments of Crohn's disease and anxiety disorder. (R. 10.) At step three, the ALJ found that Plaintiff's impairments failed to meet or equal an impairment listed in Appendix 1 of the Social Security Regulations. (R. 10.)

At step four, the ALJ found that Plaintiff had the RFC:

> to perform medium work . . . except [that] the claimant can occasionally climb ramps or stairs. She can never climb ladders, ropes or scaffolds. She can frequently balance, stoop and kneel. She can occasionally crouch. She can never crawl. She is limited to working in a facility where she is indoors and has access to a

> bathroom on the premises. She is limited to performing simple
> routine tasks with no fast-paced production requirements and no
> assembly line work. The claimant would be off task [ten percent] of
> the work day.

(R. 12.) In conducting the step-four analysis, the ALJ noted that Plaintiff alleged that she could not work due her Crohn's disease symptoms. (R. 12.) The ALJ found that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects are not entirely credible . . . ." (R. 12.) The ALJ found that the record failed to reflect "frequent medical treatment" even though Plaintiff asserted that she had frequent exacerbations of her Crohn's disease. (R. 12.) The ALJ found that Plaintiff "clearly" had a "positive response to changes in her medication regimen." (R. 12.)

The ALJ discredited Plaintiff's assertion of her mental limitations related to her anxiety because she had "not received any inpatient or outpatient treatment for her mental impairments and [] only received medications from her gastroenterologist." (R. 12.)

The ALJ assigned the following weights to the medical opinions of the various doctors: "little weight" to Dr. Guttman, the FEGS consultative physician; "little weight" to Dr. Galette, the consultative psychiatrist; "great weight" to Dr. Blackwell, the Commissioner's consultative psychologist; and "great weight" to Dr. Govindaraj, the consultative physiological physician. (R. 14–15.) The ALJ did not assign a specific weight to the opinion of Dr. Miller, one of Plaintiff's treating physicians, but found that his opinion was "not supported by the objective medical evidence of record." (R. 15.) The ALJ also did not mention or assign any weight to Dr. Hudesman's opinions. (*See* R. 14–15.)

At step five, the ALJ found that Plaintiff had no past relevant work, but concluded that, based on her age, education, work experience and RFC, Plaintiff could perform jobs that existed

14

in significant numbers in the national economy, which jobs included dry cleaner helper; cleaner, industrial; and cleaner II.  (R. 15–16.)

## II.  Discussion

### a.  Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same).  Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*."  *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted).  In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence."  *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").  The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted).  If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner.  *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  "In

making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b.    Availability of benefits

Supplemental security income is available to individuals who are "disabled" within the meaning of the SSA.[7]  To be considered disabled under the SSA, a plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner has promulgated a five-step analysis for evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920.  The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed.  If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work.  If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations.  When the claimant has such an impairment, the [Commissioner] will find the claimant disabled.  However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth

---

[7]  Supplemental security income is available to individuals who are either sixty-five years of age or older, blind or disabled and who meet certain income requirements.  42 U.S.C. §§ 1382(a), 1382c(a)(1)(A); 20 C.F.R. § 416.202.  The only issue before the Court is whether Plaintiff is disabled.

step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520"); *McIntyre*, 758 F.3d at 150 (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

### c. Analysis

Plaintiff argues that the ALJ violated the treating physician rule because she failed to: (1) assign controlling weight to Dr. Miller's opinion or provide logical and well-explained reasons for discrediting Dr. Miller's opinion; and (2) consider the opinions of Dr. Hudesman, one of Plaintiff's treating physicians. (Pl. Mem. 13–21.) The Commissioner argues that the ALJ's decison is supported by substantial evidence because Dr. Miller's opinions were not supported by the evidence in the record and were contradicted by the other medical opinions. (Comm'r Mem. 14–21.) For the reasons explained below, the Court finds that the ALJ violated the treating physician rule.

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative." *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same). But a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in [the plaintiff's] case record."[8] 20 C.F.R. § 404.1527(c)(2); *see*

*Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x

401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because

the continuity of treatment he provides and the doctor/patient relationship he develops place[s]

him in a unique position to make a complete and accurate diagnosis of his patient." (quoting

*Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

      If an ALJ declines to give a treating physician's opinion controlling weight, the ALJ must

consider a number of factors to determine how much weight to assign to the treating physician's

opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount

of medical evidence supporting the opinion; (3) the consistency of the opinion with the

remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at

418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*,

362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2) and discussing the factors).

The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion.

*Halloran*, 362 F.3d at 32. While the ALJ is not required to explicitly discuss the factors, it must

be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at

406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we

do not require that he have mentioned every item of testimony presented to him or have

---

[8] The regulations define "treating source" as the claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1502).

explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)).  Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians['] opinion . . . .").

In addition, although a "claimant has the general burden of proving that he or she has a disability within the meaning of the Act, . . . 'because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.'"  *Burgess*, 537 F.3d at 128 (alteration omitted) (first citing *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002); and then quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999)); *see also Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) ("Unlike a judge at trial, the ALJ has a duty to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" (quoting *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011))).  Pursuant to the ALJ's duty to develop the record, the ALJ must attempt to fill gaps in the record.  *See Rosa v. Callahan*, 168 F.3d 72, 79 & n.5 (2d Cir. 1999) (explaining that the ALJ must attempt to fill "clear gaps" in the record, but "where there are no obvious gaps . . . and where the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information); 20 C.F.R. § 416.912(d)(2) (requiring the ALJ to develop claimant's complete medical history).  This duty is present "[e]ven when a claimant is represented by counsel."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (collecting cases); *see also Rockwood v. Astrue*, 614 F. Supp. 2d 252, 279 (N.D.N.Y. 2009) ("[A]n ALJ has an affirmative duty to develop the record, even if the claimant is represented by

counsel, if the medical record is ambiguous or incomplete." (first citing *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); and then citing *Rosa*, 168 F.3d at 79)).

### i. The ALJ failed to explain her reasons for not giving controlling weight to treating physician Dr. Miller's opinion

The ALJ's failure to explain her reasons for not giving controlling weight to Dr. Miller's opinion as required by the Social Security Regulations requires remand.

As explained above, a court has grounds to remand a case involving an application for social security benefits when an ALJ fails to provide "good reasons" for not giving controlling weight to a treating physician's opinions. *Sanders*, 506 F. App'x at 77; *see also Halloran*, 362 F.3d at 32–33. In addition, when an ALJ does not give controlling weight to a treating physician's opinion, it must be clear from the decision that the ALJ considered the factors articulated in the Social Security Regulations for determining what weight to assign to a treating physician's opinion. *See Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(d)(2) and discussing the factors); *Petrie*, 412 F. App'x at 406. Together, these rules require that "[a]fter considering the factors, the ALJ must comprehensively set forth [her] reasons for the weight assigned to the treating physician's opinion." *Burgess*, 537 F.3d at 129 (internal quotation marks omitted) (citing *Holloran*, 362 F.3d at 33).

Here, the ALJ's decision declining to give controlling weight to Dr. Miller's opinion reads as follows:

[Plaintiff's] treating endocrinologist, Dr. Kenneth Miller, opined that [Plaintiff] would miss about [four] days per month on average due to Crohn's disease. Although, Dr. Miller maintained a treatment relationship with [Plaintiff], his opinion that [Plaintiff] would miss about [four] days per month is not supported by the objective medical evidence of record. As discussed above, [Plaintiff] has not required frequent treatment to address her symptoms of Crohn's disease, and the medical evidence documents a positive response to alterations in her medication regimen. Dr. Miller's opinion is also inconsistent with [Plaintiff]'s activities of daily living, which include shopping, traveling independently and doing chores.

(R. 15.)

Notably, the ALJ did not find that Dr. Miller's opinion was contradicted by the other medical opinion evidence; she found that it was unsupported by or inconsistent with Plaintiff's infrequent medical treatment and Plaintiff's testimony about her activities of daily living. (*See id.*) The Second Circuit has held that when a physician's opinion is not contradicted by another medical opinion, there "must be overwhelmingly compelling evidence in order to overcome it." *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009) (citing *Burgess*, 537 F.3d at 129); *see also Wilson v. Colvin*, No. 15-CV-06377, 2016 WL 5661973, at *3 (W.D.N.Y. Oct. 3, 2016) ("[W]hen a medical opinion stands uncontradicted" the conflicted evidence "must be overwhelmingly compelling in order to overcome it" (quoting *Giddings*, 333 F. App'x at 652)); *Glessing v. Comm'r of Soc. Sec.*, No. 13-CV-1254, 2014 WL 1599944, at *10 (E.D.N.Y. Apr. 21, 2014) ("But here, the ALJ did not refer to *any* medical opinion that contradicted the medical opinion of [the plaintiff's treating physician], and 'when a medical opinion stands uncontradicted, [the conflicting evidence] . . . must be overwhelmingly compelling in order to overcome it.'" (alteration omitted) (quoting *Giddings*, 333 F. App'x at 652)).

In *Giddings*, the claimant challenged an ALJ's decision finding that the claimant had the RFC to perform light work and therefore was not disabled. 333 F. App'x at 651. The claimant

argued that the RFC determination was not supported by substantial evidence, specifically, the ALJ rejected an opinion regarding the claimant's exertional limitations without explaining why that opinion lacked support in the record. *Id.* at 650–51. The Second Circuit agreed. *Id.* at 651–52. The Second Circuit held that the RFC determination was erroneous because the ALJ failed to provide sufficient reasons for rejecting the opinion of a consulting physician, Dr. Hargraves, which opinion contained more limited exertional demands than those contained in the RFC determination. *Id.* The Court explained that the ALJ "did not *refer to any medical opinion* that contradicted the medical opinion of Dr. Hargraves" regarding Plaintiff's exertional limitations. *Id.* at 652 (emphasis added). Therefore, the Court held that any evidence the ALJ relied on to undermine Dr. Hargraves' opinion "must be overwhelmingly compelling." *Id.* at 652. (citing *Burgess*, 537 F. 3d at 129). The Court noted that "Dr. Hargraves'[] opinion [was] the *only* medical opinion referenced by [the] ALJ [] that explicitly addresse[d]" the claimant's exertional limitations, and that the ALJ discredited that opinion based on "the claimant's reports of her daily activities." *Id.* The Court held that the ALJ's reliance on the claimant's reports of her daily activities "failed to provide the compelling critique needed to overcome" Dr. Hargraves' opinion. *Id.* The Court explained that the ALJ erred in finding that the claimant's testimony undermined Dr. Hargraves' opinion because her testimony was consistent with the exertional limitations in Dr. Hargraves' opinion. *Id.* at 652–55. The Court noted that "the other medical reports analyzed by [the] ALJ [] do not address, much less undercut the exertional limitations indicated by Dr. Hargraves," and therefore held that those opinions failed to provide "a sufficient basis for [the] ALJ [] to have disregarded Dr. Hargraves'[] opinion." *Id.* at 653. Based on the ALJ's errors, the Court remanded the case to the ALJ. *Id.* at 655.

Here, there are three reasons why the evidence the ALJ relied on was not "overwhelmingly compelling."  First, the ALJ relied on Plaintiff's testimony about her activities of daily living to contradict Dr. Miller's opinion that Plaintiff likely would miss four or more days of work per month, but does not explain how Plaintiff's ability to shop, travel independently and do chores undermines Dr. Miller's opinion and does not "refer to any medical opinion that contradict[s]" Dr. Miller's opinion.  (R. 15); *see Giddings*, 333 F. App'x at 652.  As in *Giddings*, the ALJ's failure to provide a thorough explanation for rejecting Dr. Miller's opinion is troubling in light of Plaintiff's entire testimony.  *See Giddings*, 333 F. App'x at 652–55.  Although the ALJ noted that Plaintiff testified that she was able to shop, travel independently and do chores, she ignored Plaintiff's limitations in completing each of those tasks.  Plaintiff testified that she was able to shop and travel independently, but also testified that she was in constant stress whenever she left home because she may have use the restroom suddenly and there may not be a restroom nearby.  (R. 42–43.)  As to Plaintiff's testimony that she could do chores, the ALJ asked Plaintiff if she could "cook/clean" and "do laundry," to which Plaintiff responded "yes."  (R. 42.)  Nothing in Plaintiff's testimony contradicts Dr. Miller's opinion that Plaintiff likely would miss work more than four times per month.  Accordingly, Plaintiff's testimony is not substantial evidence that undermines Dr. Miller's opinion.  *See Giddings*, 333 F. App'x at 654 (holding that the claimant's testimony was not substantial evidence that undermined a physician's opinion because the claimant's testimony was "consistent with, if not supportive of," the physician's opinion).  In addition, the RFC determination was flawed because the ALJ discussed the other medical opinions in the record, but did not "refer to any medical opinion that contradict[s]" Dr. Miller's opinion that Plaintiff

likely would miss work more than four days per month.[9]  *See* (R. 15); *Giddings*, 333 F. App'x at 652–55.  Thus, the Court finds that the ALJ failed to cite "overwhelmingly compelling" evidence sufficient to undermine Dr. Miller's opinion.  *See Giddings*, 333 F. App'x at 652–55 (first citing *Burgess*, 537 F.3d at 129; and then citing *McBrayer v. Sec. of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983)); *see also Wilson*, 2016 WL 5661973, at *3–4 (remanding a case to an ALJ because the ALJ afforded little weight to an uncontradicted medical opinion by first misconstruing and then relying on statements the plaintiff made during his testimony); *Glessing*, 2014 WL 1599944, at *10–11 ("But here, the ALJ did not refer to *any* medical opinion that contradicted the medical opinion of [the plaintiff's treating physician], and 'when a medical opinion stands uncontradicted, [the conflicting evidence] . . . must be overwhelmingly compelling in order to overcome it.'" (alteration omitted) (quoting *Giddings*, 333 F. App'x at 652)).

Second, the ALJ found that Dr. Miller's opinions were not supported by the record because Plaintiff's treatment was infrequent.  (R. 15.)  However, whether Plaintiff sought medical treatment on a regular basis does not weigh against Plaintiff if the ALJ never asked Plaintiff about the reason for her infrequent medical treatment.  *See* Soc. Sec. Ruling 16-3p, 2016

---

[9]  The Commissioner argues that Dr. Miller's opinion was contradicted by the opinions of Dr. Govindaraj, a consultative physician, and Dr. Guttman, Plaintiff's second treating physician. (Comm'r Mem. 16–18.)  The Court does not address these arguments because the ALJ did not express such reasoning in declining to give Dr. Miller's opinion controlling weight, and the Court may not affirm the ALJ's decision based on the Commissioner's *post hoc* arguments.  *See Lesterhuis v. Colvin*, 805 F.3d 83, 89 (2d Cir. 2015) (holding that courts "may not affirm an administrative action on grounds different from those considered by the agency" (citation and internal quotation marks omitted)); *McAllister v. Colvin*, No. 15-CV-2673, 2016 WL 4717988, at *17 (E.D.N.Y. Sept. 9, 2016) ("Such *post hoc* rationalizations are insufficient, as a matter of law, to bolster the ALJ's decision."); *Demera v. Astrue*, No. 12-CV-432, 2013 WL 391006, at *3 n.3 (E.D.N.Y. Jan. 24, 2013) ("The ALJ did not provide these explanations, however, and *post hoc* rationalizations for the ALJ's decision are not entitled to any weight." (citation omitted)).

WL 1119029, at *8 (2016) (stating that the Commissioner will not deny a person's application for social security benefits "without considering possible reasons he or she may not . . . seek treatment consistent with the degree of his or her complaints[,] [and] [the Commissioner] may need to . . . , at an administrative proceeding, ask why he or she has not . . . sought treatment in a manner consistent with his or her complaints"); *see also Burger v. Astrue*, 282 F. App'x 883, 884–85 (2d Cir. 2008) (remanding a case to an ALJ because, although the plaintiff explained her reasons for not seeking "regular medical care, . . .  the ALJ was obliged himself to develop the [] record more fully to ensure an accurate assessment"); *Nigino v. Astrue*, No. 04-CV-3207, 2009 WL 840382, at *7 (E.D.N.Y. Mar. 30, 2009) (finding that "an ALJ must not draw any inference about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment" (quoting Soc. Sec. Ruling 96–7p, 1996 WL 374186, at *7 (1996))); *see generally Moran v. Astrue*, 569 F.3d 108, 114 (2d Cir. 2009) (remanding a case to an ALJ because, *inter alia*, the ALJ did not question the plaintiff regarding certain physical limitations before finding that those limitations rendered the plaintiff not disabled). Because the ALJ never asked Plaintiff why she did not receive "frequent treatment," she erred by relying on that fact to discredit Dr. Miller's opinion.  *See id.*; *see also Burgess*, 537 F.3d at 129 (holding that, in making a decision, "the ALJ must not only develop the proof, but carefully weigh it" (citations omitted)).

In addition, the ALJ did not explain why she considered Plaintiff's treatment infrequent, which explanation would be helpful given the evidence in the record documenting Plaintiff's medical treatment.  The record reflects that on an almost monthly basis between April of 2009

and December of 2012, Plaintiff either saw Dr. Miller or had tests performed that were ordered by Dr. Miller. (R. 395–588.) Plaintiff then sought treatment from FEGS on March of 2013 and saw Dr. Miller again in April of 2013. (R. 589–92, 613–33.) Thereafter, in July of 2013, Plaintiff began treatment with Dr. Hudesman, which treatment continued bimonthly until January of 2014. (R. 600–12.) Because the record reflects otherwise, the ALJ must explain why she found that Plaintiff failed to seek "frequent treatment" in order for the Court to determine if that finding constituted substantial evidence that could undermine Dr. Miller's opinion. *See Rugless v. Comm'r of Soc. Sec.*, 548 F. App'x 698, 700 (2d Cir. 2013) (holding that remand was required because "we need some explanation of why" the ALJ discredited the opinion of the plaintiff's treating physician).

Third, the ALJ's decision does not show that she considered the factors she was required to consider when determining the weight to assign Dr. Miller's opinion. These factors include "the amount of medical evidence supporting the opinion" and "the consistency of the opinion with the remaining medical evidence." *Selian*, 708 F.3d at 418. Even though the record contains extensive documentation regarding Dr. Miller's treatment of Plaintiff between 2009 and 2013, including multiple examinations and laboratory tests, the ALJ failed to explain why that evidence does not support Dr. Miller's opinion and why his opinion is therefore not entitled to controlling weight. *See Lesterhuis*, 805 F.3d at 88 (holding that a treating physician's opinion is entitled to controlling weight when it is supported by clinical examinations and laboratory tests unless it is contradicted by substantial evidence in the record); *Winchell v. Comm'r of Soc. Sec.*, No. 14-CV-543, 2015 WL 7432377, at *3 (N.D.N.Y. Nov. 23, 2015) (remanding a case to an ALJ based on a finding that his decision to not give controlling weight to treating physician's opinion was unsupported by substantial evidence because the plaintiff's "gastrointestinal problems were well

documented, including the results of several" medical tests and examinations).  In addition, as previously noted, the ALJ did not find or state that Dr. Miller's opinion was contradicted by other medical opinion evidence.

Based on the foregoing, the Court finds that the ALJ did not have "overwhelmingly compelling" evidence that entitled her to deny giving controlling weight to Dr. Miller's opinion. *See Giddings*, 333. F. App'x at 652.  The ALJ therefore failed to provide "good reasons" for not giving controlling weight to Dr. Miller's opinion.  *See id.* at 654–55.

### ii.  The ALJ failed to consider the opinions of treating physician Dr. Hudesman

The ALJ also erred by failing to consider and assign any weight to the opinions of Dr. Hudesman.

According to the evidence in the record, Dr. Hudesman treated Plaintiff for her Crohn's disease and her anxiety from July of 2013 to January of 2014.  (R. 600–12.)  Dr. Hudesman examined Plaintiff on three separate occasions, made observations regarding Plaintiff's physical and mental limitations, issued and monitored Plaintiff's prescription medications, ordered and analyzed an MRI of Plaintiff's midsection, a colonoscopy and biopsies, and considered recommending that Plaintiff see a psychiatrist.  (*Id.*)  Accordingly, Dr. Hudesman was a treating physician.  *See Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) (noting that a "treating source" is a claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." (quoting 20 C.F.R. § 404.1502)).  Dr. Hudesman's opinions were rendered after Plaintiff filed her application on May 30, 2012, and therefore are relevant to determining whether Plaintiff was disabled after May 30, 2012.  (*See* R. 600–12.)

Nevertheless, in both recounting the evidence and assigning weight to the various physicians' medical opinions, the ALJ never mentioned Dr. Hudesman and did not assign any weight to his opinions. (*See* R. 12–15.) The ALJ's failure to consider and assign any weight to Dr. Hudesman's opinions or explain why his opinions were entitled to no weight is a separate and independent reason for remanding this case to the ALJ. *See Lesterhuis*, 805 F.3d at 89 (remanding a case to the ALJ because "[n]either the ALJ nor the Appeals Council analyzed the substance of [an] opinion" by one of the plaintiff's treating physicians); *Burgess*, 537 F.3d at 132 (remanding a case to the ALJ because "the reports of [one of the plaintiff's treating physicians] . . . w[ere] not expressly mentioned by the ALJ"); *Smith v. Astrue*, No. 10-CV-6018, 2013 WL 1681146, at *6 (E.D.N.Y. Apr. 17 , 2013) (remanding to the ALJ because "the ALJ refers to [one treating physician] only once in his ten-page decision . . . [and] fails to mention [a second treating physician] at all"); *Colon v. Astrue*, No. 10-CV-3779, 2011 WL 3511060, at *12 (E.D.N.Y. Aug. 10, 2011) (finding that because "the ALJ failed to give . . . any consideration to the opinion of" the plaintiff's treating physician, "the ALJ committed legal error in his decision and . . . remand is appropriate").

In sum, the Court finds that remand is appropriate because the ALJ failed to give good reasons for not giving controlling weight to Dr. Miller's opinions and failed to consider and assign any weight to Dr. Hudesman's opinion.[10]

---

[10] Because the Court remands based on the ALJ's errors regarding the treating physician rule, the Court does not address Plaintiff's arguments that the ALJ failed to develop the record as to Dr. Hudesman's opinions or that the ALJ's credibility finding regarding Plaintiff's testimony was not supported by substantial evidence. (*See* Pl. Mem. 18–23.) The Court notes, however, that the ALJ should carefully develop the record as to any unanswered questions she may have regarding Plaintiff's physical or mental limitations and the medical opinions or lack thereof pertaining to those limitations. *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) ("Unlike a judge at trial, the ALJ has a duty to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'").

### III.  Conclusion

For the foregoing reasons, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion for judgment on the pleadings.  The Court vacates the Commissioner's decision and remands this action for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).  The Clerk of Court is directed to close this case.


SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge


Dated:  March 29, 2017
        Brooklyn, New York